UNITED STATES of America, Plaintiff,

v.

**Adrian Bernard BRUMFIELD,
Defendant.**

**Criminal A. 95–CR–374.**

United States District Court,
D. Colorado.

Jan. 3, 1996.

Kathleen M. Tafoya, Assistant United States Attorney, Denver, CO, for Plaintiff.

Warren R. Williamson, Assistant Federal Public Defender, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant, Adrian Bernard Brumfield (Brumfield), moves to suppress evidence obtained from the warrantless search of a backpack and cooler and statements obtained in violation of his Fourth Amendment rights. Brumfield was arrested at the Greyhound Bus station in Denver, Colorado after Drug Enforcement Agents and Denver Police Officers conducted a drug interdiction operation on the bus he was traveling on from Los Angeles, California. Brumfield contends that the drug interdiction operation constituted an unreasonable seizure under the Fourth Amendment. He further contends that probable cause did not exist for his arrest and, thus, statements he made shortly thereafter must be suppressed as fruit of the illegal arrest. The motion is fully briefed and heard. For the reasons set forth in this order I will suppress the evidence obtained from the backpack and all statements made by Brumfield after his arrest.

### I.

On October 5, 1995 Brumfield was traveling on a Greyhound bus which originated in Los Angeles, California. The bus arrived at the Denver Greyhound terminal at approximately 10:20 a.m. for a scheduled lay-over for those passengers continuing to Chicago. Because the bus from Los Angeles was scheduled for an equipment change, all passengers were required to deboard in Denver whether or not it was their final destination. Upon arrival, D.E.A. Agents and Denver Police Officers met the bus. DEA Agent Phillip Hart (Agent Hart) boarded the bus, while Detective Dave Kechter (Detective Kechter), Agent Snow and a narcotics canine waited outside the bus. From the front of the bus, Agent Hart announced to the passengers over the bus intercom that a drug interdic-

tion operation was in effect, the bus was under investigation, and a narcotics canine would be standing outside the bus as they got off and would "alert" if they were carrying any controlled substance. He then instructed the passengers to disembark with all their carry on luggage in their right hand so that the luggage would pass by the narcotics dog. At the hearing, Agent Hart testified that the narcotics dog was not on "alert." The dog's presence was a ruse to provoke reactions by the passengers which the officers and agents could observe.

Detective Kechter, in plain clothes with his badge visible, was standing outside the bus when Agent Hart made the announcement. He stood approximately five to seven feet from the bus and observed the behavior of the passengers through the tinted windows of the bus. He testified that he saw a black male passenger pick up a small red and white Igloo-type cooler, look out the window toward him and immediately put the cooler down.

After the passengers left the bus, Agent Hart noticed a black backpack left in the overhead rack. Detective Kechter then boarded the bus and asked Agent Hart if he had noticed a cooler. Detective Kechter found the cooler a row behind where the backpack was located. The backpack was opened and three duct-taped packages (later determined to be amphetamine and methamphetamine) were discovered. Detective Kechter opened the cooler and saw drinks and food inside. He then left to look for the man he had seen with the cooler.

After searching for a few minutes, Detective Kechter was unable to find the suspect and returned to the bus. He removed the items from the cooler and noticed that it was heavier than a normal, empty cooler. He shook the cooler and heard something rattle inside. He noticed an odor of sealant and that the cooler appeared to have been resealed with silicone. Detective Kechter then got in his police car to locate the suspect.

As he left the terminal, Detective Kechter saw Brumfield, the man he saw on the bus with the cooler, standing on the corner. He approached Brumfield and began questioning him. Detective Kechter asked Brumfield if

he had been on the bus from Los Angeles. Brumfield said that he had. Detective Kechter then requested his bus ticket. It was a one-way ticket from Los Angeles to Denver in the name of "Mr. Adrian." Brumfield then produced identification at Detective Kechter's request. The identification was a California drivers license bearing the name Adrian Brumfield. Detective Kechter next asked Brumfield if he could search his bag. Brumfield consented. The bag contained various personal items but no illegal substances. Detective Kechter questioned Brumfield about the cooler. Brumfield said that he had moved the cooler to retrieve his personal things when leaving the bus. He also told Detective Kechter that he saw a blond woman with the cooler. Detective Kechter then arrested Brumfield and took him to the Denver Police Department.

At the police station Detective Kechter again examined the cooler. He removed the sealant from inside the cooler and found approximately 1.2 to 1.5 kilograms of crack cocaine where the cooler insulation would normally have been. Brumfield was placed in an interrogation room where Agent Hart read Brumfield his Miranda rights. Brumfield acknowledged these rights and signed a waiver of rights form. Agent Hart then questioned Brumfield about the backpack and cooler. After several stories, Brumfield admitted he had been in possession of the black backpack and was to deliver it to someone in Denver named Tina. He stated he would receive $2,000 for his services. Brumfield has never claimed any ownership or possessory interest in the cooler.

## II.

The Government contends that Brumfield has no standing to challenge the search of the cooler and that he abandoned the backpack when he left the bus. In contrast, Brumfield asserts that his Fourth Amendment rights were violated when the drug interdiction task force seized him as well as all other passengers on the bus from Los Angeles. Thus, he argues, any abandonment of the backpack was not voluntary. Therefore, the search of the backpack was illegal and any evidence found as a result of the search must be suppressed. *Coolidge v. New*

*Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

### A.

■ "A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his constitutional rights have been violated." *United States v. Rubio–Rivera,* 917 F.2d 1271, 1274–75 (10th Cir. 1990). To show a violation of his Fourth Amendment rights, Brumfield must establish a subjective expectation of privacy in the items searched and that expectation must be one which society recognizes as objectively reasonable. *United States v. Conway,* 73 F.3d 975 (10th Cir.1995). Brumfield has never asserted any interest in the cooler stating that he merely picked up the cooler to retrieve his personal belongings as he was leaving the bus. To support his claim of standing to challenge the seizure and search of the cooler Brumfield relies solely on Agent Hart's testimony that Brumfield's fingerprint was found on the outside of the cooler. This evidence is merely consistent with his statement that he moved the cooler to get his personal belongings. Brumfield has the burden to establish his reasonable expectation of privacy in the cooler which society is prepared to recognize. *Id.* I conclude Brumfield has wholly failed to meet this burden.

### B.

■ Property is abandoned when the individual has not retained any reasonable expectation of privacy in the object. *United States v. Hernandez,* 7 F.3d 944, 947 (10th Cir.1993). However, "An abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary." *United States v. Austin,* 66 F.3d 1115, 1118 (10th Cir.1995). Thus, as to the backpack, the first issue is whether Brumfield's Fourth Amendment rights were violated when Agent Hart entered the bus and commanded all passengers to disembark as dictated. *See United States v. Hernandez,* 7 F.3d 944, 946 (10th Cir. 1993).

■ The Fourth Amendment proclaims that "The right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). The Fourth Amendment inquiry usually focuses on whether a reasonable person would have felt free to leave under the totality of the circumstances. *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983). However, the facts here do not lend themselves to this inquiry because the passengers had to leave the bus independent of the officers' conduct.

However, *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) is instructive. There two officers boarded a bus bound for Atlanta on a stopover in Fort Lauderdale, Florida. The officers randomly approached passengers and asked them questions. The officers approached Bostick, questioned him, and requested consent to search his luggage. Before searching the luggage the officers specifically advised him of his right to refuse consent. The Florida Supreme Court adopted a per se rule applicable to police-citizen encounters on a public bus. It ruled that an impermissible seizure occurs when police board a bus at a scheduled stop for drug interdiction purposes without articulable reason for doing so and during the process question passengers. The sole issue addressed by the Supreme Court was whether such an encounter constitutes a Fourth Amendment seizure. Holding that Florida erred in adopting the per se rule, the Supreme Court reasoned that the setting of the encounter is but one factor in determining whether it was coercive. The Florida Court's focus on the "free to leave" inquiry failed to measure the encounter's coercive effect because Bostick was continuing on the bus anyway. Rather, under the circumstances, the proper inquiry was "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991).

Here, all passengers were required to leave the Los Angeles bus because they had reached their final destination or were to board another bus to continue on to Chicago. Thus, as in *Florida v. Bostick*, whether Brumfield felt free to leave is not the proper inquiry because he was required to leave the bus independent of the presence of the police officers. Rather, the focus of the analysis must be whether a reasonable person would have felt free to decline the officers' demands to depart the bus in the particular method and manner directed.

When Agent Hart boarded the bus he announced that a drug interdiction operation was in effect. At that point, Detective Kechter was positioned outside of the bus and Agent Snow and his narcotics dog were located directly next to the exit. Agent Hart then gave specific directions to the passengers on when and how they were to exit the bus. Each passenger was told to carry all luggage with them and leave nothing behind. They were instructed to carry their luggage in their right hand as they exited the bus and walk past the narcotics dog which, they were told, would alert if it detected any controlled substance. Agent Hart testified that the passengers were never informed that they could decline compliance with his instructions. Moreover, the officers and agents controlled the only means of departure. It is clear that the instructions issued by Agent Hart to the passengers were not requests. Rather they were orders which conveyed a message that compliance was required. *Bostick*, 501 U.S. at 435, 111 S.Ct. at 2386–87. Furthermore, these orders were intended to restrict the freedom of movement of all passengers on the bus. Here, unlike *Florida v. Bostick*, when Agent Hart boarded the bus, announced his purpose, and issued directions he set a confrontational tone for the interdiction operation. The encounter between the officers and passengers was coercive, not consensual. No reasonable person would have felt that he had the choice to act in any manner other than that dictated by Agent Hart. Under the totality of the circum-

stances, I find and conclude that a reasonable person would not have felt free to decline the agent's directions or otherwise terminate the encounter. *Bostick,* 501 U.S. at 436, 111 S.Ct. at 2387. I further find and conclude that the officers' conduct in this case constituted a governmental termination of Brumfield's freedom of movement through means intentionally applied. *Brower,* 489 U.S. at 597, 109 S.Ct. at 1381–82. Thus, I conclude as a matter of law that there was a Fourth Amendment seizure of Brumfield's person.

█ The Fourth Amendment, however, does not prohibit all seizures, only those that are unreasonable. Every Fourth Amendment seizure must have an objective justification. *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980). "[I]n determining whether the seizure ... [is] 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). "[T]he constitutionality of such seizures [short of traditional arrest] involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

The drug interdiction method used here is intended to advance the public interest in suppressing illegal drug trafficking and, as a result, further the war on drugs. The magnitude of the problem caused by drugs in this country is manifest. The effort on the part of drug interdiction agents and officers must, however, be balanced against the intrusion on individual liberty because the Fourth Amendment protects individual rights not public goals.

The Fourth Amendment guarantees "the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas,* 443 U.S. at 50, 99 S.Ct. at 2640. Thus, to justify a seizure, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." *Id.* at 22, 88 S.Ct. at 1880–81.

The circumstances in this case are similar to those addressed by the Supreme Court in *Brown v. Texas.* There, the officers observed two men walking away from each other in an alley in El Paso, Texas. The officers did not see any specific misconduct between the men but stopped the defendant because the situation "looked suspicious." The only articulable basis for the officers' "hunch" was that the area was known for its high drug trafficking. When confronted, the defendant refused to identify himself. He was subsequently arrested for violating § 38.20 of the Texas Code which requires one who is "lawfully" stopped to provide identification to an officer when requested. The Supreme Court determined that none of the circumstances preceding the detention of the defendant constituted a reasonable suspicion that he was involved in criminal conduct and held that in the absence of any basis for suspecting the defendant of misconduct, the individual right to personal freedom free from police interference prevailed over the public interest. "When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practice exceeds tolerable limits." *Brown,* 443 U.S. at 52, 99 S.Ct. at 2641.

Here, as in *Brown,* the sole basis proffered by the government for detaining the passengers during the drug interdiction operation was that the bus came from Los Angeles, a known drug origination point. Based on this information alone, the agents and officers detained all passengers on the bus and required them to act in compliance with their instructions. A reasonable person in Brumfield's position would have experienced both annoyance and trepidation at the officers' commands.

The intensity of the seizure is demonstrated by the number of officers, the presence of the narcotics dog, and the way the officers controlled the manner each individual left the

bus as well as the only means of departure. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Balancing this coercive police intrusion on the individual's right to personal freedom against the public interest served, I conclude that the balance tips in favor of the individual's right to be free from this arbitrary police action. To hold otherwise would permit officers to engage in this such constitutionally intrusive and offensive tactics based solely on geographical data applied to a group of individuals.

Moreover, the drug interdiction here is not analogous to the "drug courier profile" cases. In the drug courier profile context, an officer typically approaches an individual based on various indicators observed, including her origination point. *See Florida v. Rodriguez,* 469 U.S. 1, 3, 105 S.Ct. 308, 309, 83 L.Ed.2d 165 (1984). The initial encounter is consensual so long as a reasonable person would feel free to leave. *See Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). In this case, the initial encounter was not consensual and the behavior of the passengers was not observed until the intrusion had occurred. The police conduct in the drug courier profile context is passive followed by consensual questioning. In contrast, here, the police actively initiated the contact and required compliance with departure instructions in order to observe the reaction of the passengers.

This drug interdiction is also distinguishable from situations where the Supreme Court has approved limited seizures based on no articuable suspicion at border and sobriety checkpoints. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 561–62, 96 S.Ct. 3074, 3084–85, 49 L.Ed.2d 1116 (1976); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 448–49, 110 S.Ct. 2481, 2484–85, 110 L.Ed.2d 412 (1990).

In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court determined that brief stops at permanent border checkpoints did not violate the Fourth Amendment. Applying the *Brown v. Texas* balancing test, the Court recognized a substantial public interest in intercepting illegal aliens attempting to enter the United States. *Martinez–Fuerte,* 428 U.S. at 556, 96 S.Ct. at 3082. Moreover,

border checkpoints are necessary to enforce our immigration laws. Analyzing the effects of the seizure on individual liberty, the Court reasoned that the objective intrusion, the stop itself, the questioning, and the visual inspection create a permissible limited intrusion on the individual's Fourth Amendment interests. The Court recognized, however, that checkpoint stops are distinct from roving patrols "because the subjective intrusion the generating of concern or even fright on the part of lawful travelers is appreciably less in the case of a checkpoint stop." *Id.* at 557, 96 S.Ct. at 3083. This conclusion was founded in part on the fact that "the motorist can see that other vehicles are being stopped, he can see visible signs of the officer's authority, and he is much less likely to be frightened or annoyed by the intrusion." *Id.* In contrast, the unpredictable nature of a roving patrol may frighten individuals.

In *Michigan v. Sitz,* the Supreme Court reversed the Michigan Court's determination that sobriety checkpoints violate the Fourth Amendment. The sobriety checkpoints were conducted pursuant to specific guidelines. All vehicles were stopped briefly at the checkpoint and its driver observed for signs of intoxication. The Court determined that the state's interest in preventing drunk driving advanced by the checkpoint outweighed the limited degree of intrusion upon the individual motorist. The Court agreed with the Michigan Court's analysis regarding the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, as minimal. The Court, however, disagreed with the Michigan Court's determination that the sobriety checkpoint was illegal because of its subjective intrusion or potential to create fear and surprise. The Court stated that "The 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.* at 452, 110 S.Ct. at 2486.

The seizure here, however, is distinct from that in *Martinez–Fuerte* or *Sitz.* There, the seizures were conducted pursuant to specific guidelines which limited the officers' discre-

tion. In contrast, here, the government presents no evidence that the officers were provided with guidelines on how to conduct the drug interdiction. In *Martinez–Fuerte* and *Sitz,* the occupants of the vehicle were seized for approximately twenty-five to thirty seconds during which time the officer asked them a few questions and observed their behavior. Although the length of the seizure here was not significantly greater, the intensity of the seizure was significantly greater. The officers' orders and presence constituted a substantial show of force resulting in seizure of the bus passengers, including Brumfield, absent any semblance of *Terry* reasonable suspicion. *Cf. United States v. Hernandez,* 7 F.3d at 946. Moreover, in *Martinez–Fuerte,* the existence of the checkpoint was commonly known among international travelers while in *Sitz,* announcements were made in the paper and other media alerting the public about the checkpoints. In contrast, when the passengers boarded the Los Angeles bus they were unaware that they would be subjected to detention for any purpose at any point along their route. It was only after Agent Hart boarded the bus and ordered the passengers to act in conformance with his instructions that they became aware of the drug interdiction. The absence of any prior warning regarding this type of drug interdiction would create significant fear and surprise in a reasonable person. Because the bus passengers were not warned of the drug interdiction they lacked information which could influence their decision to travel. This prior warning was found significant to the "subjective intrusion" analysis in *Martinez–Fuerte* and *Sitz* because the individuals seized knew the purpose of the seizure before being stopped which helped to minimize their fear and surprise. Finally, in this case, unlike *Martinez–Fuerte* or *Sitz,* the government proffers no special governmental need beyond the normal need for law enforcement which justifies an intrusion without articuable suspicion. *See Sitz,* 496 U.S. at 449–50. Thus, this case does not fit within the narrow parameters of *Martinez–Fuerte* and *Sitz.* Rather it is more analogous to the situation presented in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

In *Brignoni–Ponce,* the Supreme Court addressed whether roving border patrols had the authority to stop vehicles near the border and question the occupants when the only ground for suspicion was that the occupants appeared to be of Mexican ancestry. In conducting these patrols, officers randomly stopped motorists at any time, on any roadway within 100 miles of the border, without reason to suspect that they had been involved in illegal activity. *Id.* at 883, 95 S.Ct. at 2581. The Supreme Court held that the unfettered discretion afforded the officers in choosing which cars to stop violated the Fourth Amendment. The roving border patrols were not conducted pursuant to specific guidelines which permitted the officers to make arbitrary determinations regarding which vehicles to stop. Moreover, the occupants had no warning about the seizure and, therefore, suffered significant fear and surprise. The Supreme Court held that the officers must be aware of specific articuable facts, which taken together, warrant a reasonable suspicion that illegal aliens are in the vehicle or that illegal activity was taking place before stopping the vehicle. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Absent such reasonable suspicion the seizure was unjustified.

Here, the officers and agents randomly stopped buses based solely on their origination from Los Angeles. Since the officers lacked reasonable suspicion about any passenger on the bus, I conclude the seizure violated Brumfield's Fourth Amendment rights. Having determined that the officers' conduct violated Brumfield's Fourth Amendment rights, any subsequent abandonment of his property was involuntary. The officers searched the backpack without a warrant and without Brumfield's consent. Therefore, I conclude that all evidence obtained as a result of the seizure and search of the backpack must be suppressed.

### III.

▪ Brumfield next contends that any statements he made while in custody must be suppressed. His principle argument is that his statements were obtained following his arrest for which there was no probable cause. He also argues that his statements were

taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"It is well settled that an investigative stop is justified where police officers have 'a reasonable articuable suspicion that the detainee has been, is or is about to be engaged in criminal activity.' *United States v. Nicholson,* 983 F.2d 983, 987 (10th Cir.) [sic] (citing *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 [ (1968) ] ). The presence of reasonable suspicion is not determined by any one factor, but by the totality of the circumstances." *United States v. Elkins,* 70 F.3d 81, 83 (10th Cir.1995).

When Detective Kechter initially approached Brumfield he knew that Brumfield was seated on the bus in the vicinity of where the cooler and backpack were found and he had observed Brumfield briefly pick up and put down the cooler. Pursuant to *Terry v. Ohio,* these facts were sufficient to justify an encounter based on reasonable suspicion. *See United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989). However, after questioning Brumfield and conducting a search of his possessions, Detective Kechter learned nothing new, qualitatively or quantitatively, which, when added to his reasonable suspicion, would rise to the level of probable cause. Indeed, Brumfield's answers served to. decrease the quantum of suspicion raised by his previous behavior. Brumfield freely stated that he had been on the bus from Los Angeles and produced a valid ticket. Simply because the ticket was issued in the name of "Mr. Adrian" does not necessarily suggest Brumfield was traveling under an alias. Under the circumstances this may also suggest ticket agent error. Furthermore, Brumfield produced a valid drivers license with his legal name, Adrian Brumfield. When questioned about the cooler, Brumfield provided a logical explanation for his temporary contact with it. Moreover, except for Brumfield's general proximity on the bus to where the backpack was found, Detective Kechter possessed no information whatsoever linking Brumfield to the backpack. None of the officers saw Brumfield touch the backpack. There was no query of other passengers whether they had seen Brumfield with the backpack. *See e.g., United States v. Hernandez,* 7 F.3d at 945 (bus passenger identified defendant as the owner of the seized backpack). Nor did Detective Kechter question Brumfield about the backpack before arresting him.

"Probable cause exists when a police officer of reasonable caution would be justified in believing that the individual to be arrested has committed or is about to commit a crime." *United States v. Chavez,* 812 F.2d 1295, 1301 (10th Cir.1987). Innocent behavior can be the basis of probable cause depending on the degree of suspicion attached to the particular noncriminal acts. *See United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989). However, any suspicion attached to Brumfield's otherwise innocent acts was neutralized by Detective Kechter's questioning. Under the totality of the circumstances, I conclude that a reasonable officer would not have been justified in believing that Brumfield had committed or was in the process of committing a crime. I therefore conclude that probable cause did not exist at the time of Brumfield's arrest.

■ Having determined that Detective Kechter lacked probable cause at the time of the arrest, the question remains "whether the connection between the unconstitutional police conduct and the incriminating statements" is sufficiently attenuated to purge the taint of the illegal arrest. *Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979). Brumfield's statements were voluntary for purposes of the Fifth Amendment because he acknowledged and waived his rights before providing statements to Agent Hart. However, "[t]he fact that a confession may be voluntary for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest." *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982). Rather, in order to comply with the Fourth Amendment, it must be shown that the statements were not based on an exploitation of the illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).

In *Brown v. Illinois,* the Supreme Court identified several factors to be considered in determining whether the confession is ob-

tained by exploitation of an illegal arrest: the temporal proximity of the arrest and confession, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.* Approximately an hour and a half passed between the time Brumfield was arrested and the time he gave his statements at the Denver Police Station. While at the station, Brumfield was placed in an interrogation room and interviewed three separate times by Agent Hart. The government proffered no evidence of any significant intervening event which purged the taint of the illegal arrest during this interrogation process. Furthermore, it is clear that at its inception, the drug interdiction operation violated the Fourth Amendment's protection against unreasonable seizures. The evidence establishes that Brumfield's statements flowed directly from the illegal arrest and subsequent interrogation. Thus, I conclude, as a matter of law that the Brumfield's statements were the tainted fruit of the violation of his Fourth Amendment rights and must be suppressed.

Accordingly it is ORDERED that:

The motion to suppress is GRANTED in part and DENIED in part. The backpack and its contents and defendant's post arrest statements are suppressed. The motion is denied as to the cooler and its contents for lack of standing.