**UNITED STATES of America, Plaintiff,**

v.

**Randolph Michael BARRETT, Defendant.**

**No. 3:97CR731.**

United States District Court,
N.D. Ohio,
Western Division.

Aug. 11, 1997.

**1106**

John Czarnecki, Cooper, Walinski & Cramer, Toledo, OH, Steven Lynn Crossmock, Boyk & McCulley, Toledo, OH, Harvey Slovis, Bronx, NY, for Defendant.

Thomas A. Karol, Office of U.S. Atty., Toledo, OH, for Plaintiff.

### Order

CARR, District Judge.

This is a criminal case in which the defendant has moved to suppress heroin seized from him following a search of his suitcase. (Doc. 24). The government contends that the search and seizure were lawfully based on the defendant's consent. The defendant contends that he was unlawfully seized and that the heroin was seized as a result of such unlawful seizure and, as well, that he did not consent to the search of his bag.

For the reasons that follow, I conclude that the defendant was unlawfully seized and the heroin, which was discovered as a result of exploitation of that primary illegality, must be suppressed.

The defendant was a passenger on an Amtrak train that arrived from the east in Toledo, Ohio, around 9:00 a.m. on April 17, 1997. He had a ticket to Detroit; Amtrak passengers destined for that city are taken there by Amtrak bus, there being no rail connection between Detroit and Toledo.

Prior to the arrival of the defendant's train, Sgt. Mark Ellenwood of the Ottawa Hills, Ohio, Police Department, who was assigned to a drug task force under the aegis of the Drug Enforcement Administration, had been informed that a passenger traveling under the name Michael Brown had purchased his ticket with cash shortly before the train's departure and his "call back" number had been determined to be an answering machine with a woman's voice.[1]

After the train arrived, Sgt. Ellenwood asked the ticket agent where Michael Brown was sitting. The agent told him that that passenger was seated on the left side of the

---

1. There is some discrepancy in the record about what was learned through the check of the call back number. Although at one point Sgt. Ellenwood testified that the number had been someone other than Michael Brown's (Tr. 18). Other testimony was that a call to that number discovered merely a female "voice recorder." (Tr. 54).

I find that it is more likely than not that the call to the call back number resulted in a connection with a female's voice on an answering machine. That was an entirely neutral fact, not indicative of any criminal conduct on Michael Brown's part.

bus and was wearing a coat and tie. The officer boarded the bus; in the meantime, he had been joined by Det. John Greenwood, of the Toledo Police Department, who was working with the other task force officers at the train station.

Det. Greenwood also boarded the bus. He testified that he told the driver that there would be "a short delay." (Tr. 56). According to Det. Greenwood, "Lot[s] of times, when trains come in, buses want to leave on time, and I told him we had to talk to someone and he could get on the way as soon as possible." (Tr. 61). Det. Greenwood "talked to the bus driver for a few minutes," engaging in "just conversation" (Tr. 57); at some point, he had to respond to a cellular telephone call and he left the bus and went to the train station before the encounter between the defendant and Sgt. Ellenwood was completed. (Tr. 57).

Sgt. Ellenwood passed the defendant's seat, turned, and approached him from the rear. He asked the defendant if he "mind[ed] if I asked him a few questions." The defendant, according to Sgt. Ellenwood, said, "Sure." (Tr. 11). The officer then asked to see the defendant's train ticket, which the defendant gave to him. After looking at and returning the ticket,[2] Sgt. Ellenwood asked the defendant if he had any identification. Though the defendant at first said that he did, he was unable to find any.

Next the officer asked the defendant about his destination, which (the defendant stated, was Detroit) and whether he had any luggage. The defendant indicated a bag over his head. At that point, the officer took the bag down from the luggage rack.

The record is in conflict with regard to whether the officer, as he testified, asked the defendant before taking the bag down, whether he "mind[ed] if I pull it down?" (Tr. 12). The defendant, according to Sgt. Ellenwood, said, "No," whereupon the officer took the bag down. Then he asked the defendant if he "mind[ed] if I search your bag?" (Tr. 12–13), to which the defendant, according to Sgt. Ellenwood, responded, "Yes, you can search the bag." (Tr. 13). The search was conducted, and heroin was discovered in a coat in the bag.

The defendant disputed the officer's account.[3] He testified that the officer asked, "do I mind if he searched my bag and that is when I said yes." (Tr. 37). On further questioning, the defendant testified that his response was, "Yes, I do mind." (Tr. 51).

I credit the officer's testimony about his exchange with the defendant, despite the defendant's testimony about his refusal to consent, and, as well, his understanding of his right to not consent (based on the prior advice of his lawyer about his right). A critical aspect of this situation was the presence outside the bus of a drug detection dog. The defendant had seen the dog, and, under the circumstances, it was reasonable for him to apprehend that it was more likely that the dog would detect the presence of heroin than it was that it would be found concealed in the pocket of the coat. It would also have been reasonable for the defendant to have anticipated that the officer would have taken the bag for inspection by the dog if he refused to permit the bag to be searched.

From the officer's standpoint, he would have lost little if the defendant refused to

---

**2.** Sgt. Ellenwood testified that the ticket "was a combination bus and train ticket, from Albuquerque." (Tr. 12). This must be a mistake, because the train was arriving from the East, not the West (Tr. 6). Albuquerque was the location of the DEA facility from which the information about a passenger named Michael Brown had been obtained.

**3.** Defense counsel argues that statements contained in the affidavit submitted with a criminal complaint and arrest warrant after the defendant's arrest indicate that the officer took possession of the defendant's bag without asking permission to do so. This indirect evidence is outweighed by the officer's testimony that, after

he determined that the defendant had a bag in the overhead rack, he asked if the defendant minded if he pulled the bag down. (Tr. 12). According to the defendant, the officer asked if he could search the bag *before* he took it down. (Tr. 38). Because I find it more likely than not that the defendant did not refuse permission to search the bag, the conflict in direct testimony about what was or was not said before the bag was removed is immaterial. Either the officer asked permission to take the bag down, got an affirmative response, and then asked to search it, or he asked to search it, and got an affirmative response, before he took the bag down. Either way, there was no unlawful seizure of the bag before consent was given to the search.

permit him to inspect the bag. When asked whether, if the defendant had said no, he would have left, the officer stated, "Correct." (Tr. 24). When also asked, however, if he would have "employed any more police methods," the officer responded, "Maybe."

In my view, this response by the officer indicates his anticipation that, if the defendant had refused to permit a search of his bag, he would have taken it outside to be checked by the dog. Because the dog was at hand, there would have been little reason for the officer to have disregarded the defendant's refusal to grant consent to search the bag.[4]

I conclude, accordingly, that there was no unlawful seizure of the bag or search of its contents because the defendant consented to those activities. That conclusion does not, however, resolve the issues raised by the motion to suppress and the record: there remains a question about the legal consequences of Det. Greenwood's instruction to the bus driver that there would be a short delay. Prior to the instruction, Sgt. Ellenwood had participated in the arrest of two other passengers who had disembarked from the Amtrak train. In light of that occurrence and the fact that Det. Greenwood apparently felt it necessary to tell the bus driver that there would be a short delay, I find that it is more likely than not that the bus was due to depart as the encounter between Sgt. Ellenwood and the defendant was occurring. In light of that finding, I also find that but for the delay caused by that encounter, the bus would have departed before the encounter was completed. As a consequence of the instruction to the driver, I find, accordingly, that the defendant and the other passengers were "seized," as that term is used in the Fourth Amendment.

The test for determining if an individual has been seized under the Fourth Amendment is whether a reasonable person would feel free to disregard the officer and go about his or her business. *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991). A particular encounter constitutes a seizure when, considering all the surrounding circumstances, the court determines that a reasonable person would not consider himself free to decline the police request or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991).

The Supreme Court addressed the police practice of boarding buses in *Florida v. Bostick*, 501 U.S. at 429, 111 S.Ct. 2382 in which the Court reversed a Florida Supreme Court ruling that a search on a bus was *per se* a violation of the Fourth Amendment. The Supreme Court analogized the contact on a bus as simply one between citizen and an inquiring officer. Such contact is permissible even without an articulable suspicion. *Id.* at 435, 111 S.Ct. at 2386 (*citing I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)). Even though a person would not feel free to leave under the circumstances, the person is not free to leave because he is on a bus en route somewhere, not because of the police encounter. *Id.* at 436, 111 S.Ct. at 2387. The test for Fourth Amendment seizure became whether a reasonable person would consider himself free to decline the police request or terminate the encounter. *Id.* at 436–37, 111 S.Ct. at 2387–

---

4. I reach this conclusion despite the officer's acknowledgment that "if he said no, that would be the end of it." (Tr. 24). I believe that, when read in context and light of the availability of the drug detection dog, the officer interpreted "the end of it" to mean the end of his efforts to secure the defendant's consent to search the bag.

I also note that about twenty-five other persons were on the bus. (Tr. 24). Some of those persons, in all likelihood, would have been within earshot of the defendant. If so, and the officer had proceeded in the face of a refusal by the defendant to search the bag, there would have been the possibility (albeit remote) that one or more of the other passengers might have come

forward at some point to assert that the officer had not complied with that refusal. No matter how remote that likelihood, the fact remains that the exchange occurred in a public or semi-public place in the presence of some number of persons who might have become witnesses if police misconduct were readily apparent.

This is not to rely on "missing witness" evidence. It is, rather, simply to point out that the conversation between the defendant and Sgt. Ellenwood did not occur in private, and there would have been some risk to the officer if he had ignored a refusal by the defendant to permit his bag to be searched.

88. The fact that defendant was on a bus, which is naturally a restricted environment remains a factor in this test, but not the only one. *Id.* at 437, 111 S.Ct. at 2387–88.

I need not address the requirements of *Bostick*, however, because the police seized the defendant and all other passengers on the bus before encountering the defendant. The detectives boarded the bus and informed the bus driver that there would be a delay. I have not located a case in which the police ordered the bus driver not to depart. In *Bostick*, for example, the bus was stopped at a scheduled break. *Id.* at 431, 111 S.Ct. at 2384. In other cases, police have either asked the bus driver for permission to come aboard or spoke with citizens during scheduled breaks.[5] *United States v. Madison*, 936 F.2d 90 (2d Cir.1991) (no seizure when conversation took place while other passengers were still boarding); *United States v. Flowers*, 912 F.2d 707 (4th Cir.1990) (during layover, permission given by Greyhound to monitor buses); *United States v. Jones*, 914 F.Supp. 421 (D.Co.1996) (no seizure during scheduled layover); *United States v. Brumfield*, 910 F.Supp. 1528 (D.Co.1996) (during layover, evidence suppressed on other grounds); *United States v. Garcia*, 909 F.Supp. 334 (D.Md.1995) (permission from bus driver); *United States v. Chandler*, 744 F.Supp. 333 (D.D.C.1990) (during scheduled layover, evidence suppressed on other grounds); *United States v. Rembert*, 694 F.Supp. 163 (W.D.N.C.1988) (permission to board the bus).

■ In this case, the bus driver was ordered to not depart until the officers had spoken with defendant. Even though the delay, according to Sgt. Ellenwood, only lasted two minutes (Tr. 14), it is enough to constitute a seizure for the purposes of the Fourth Amendment.[6] Brevity of the stop is not determinative. The Supreme Court has held that a stop of an automobile by police

officers, even if only for a brief period of time constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, —— U.S. ——, ——, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324 (1983) (an individual "may not be detained even momentarily without reasonable, objective grounds for doing so"); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ("stopping an automobile and detaining its occupants constitutes a 'seizure' . . . even though the purpose of the stop is limited and the resulting detention quite brief"); *United States v. Torres*, 65 F.3d 1241, 1245 (4th Cir.1995). When Det. Greenwood told the driver that he could not yet depart, defendant was seized for the purposes of the Fourth Amendment.

The next question is whether the seizure was lawful. Under *Terry v. Ohio*, 392 U.S. 1, 21, 27, 88 S.Ct. 1868, 1879–80, 1883, 20 L.Ed.2d 889 (1968), police must have a reasonable and articulable suspicion to seize defendant for a limited investigatory purpose. Because the officers had no reasonable suspicion to detain defendant, even for à few minutes, the heroin found as a result of the exploitation of this illegal seizure shall be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *United States v. Grant*, 920 F.2d 376, 389–90 (6th Cir.1990).

■ A police officer may briefly detain a citizen for questioning even if the officer does not have probable cause to believe that the citizen is involved in criminal activity. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. The officer must, however, "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). *See also, Terry*, 392 U.S. at 30, 88 S.Ct. at 1884; *United States v.*

---

5. The only possible exception is *United States v. Boone*, 67 F.3d 76 (5th Cir.1995), in which the Fifth Circuit held that defendant was not seized when he and all other passengers were ordered off of a bus by narcotics agents, and was subject to a consensual contact with police when he entered the terminal. The Fifth Circuit was surprised, as am I, that defendant did not focus on the seizure of the entire bus by authorities. *Id.* at 79 n. 2. I find the case inapposite because it

does not address the issue here: namely, that all the passengers, including the defendant were detained.

6. I find, in any event, that the encounter was somewhat longer than two minutes. Det. Greenwood testified that he had spoken with the driver for a "few minutes" before taking the cellular phone call. (Tr. 57).

*Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). An officer's hunch or generalized suspicion is not sufficient to justify the detention of a citizen. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The Fourth Amendment requires "some minimal level of objective justification." *I.N.S. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). A reasonable articulable suspicion is considerably less than probable cause. *United States v. Grant,* 920 F.2d 376, 384 (6th Cir.1990). Probable cause means "a fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). A court must consider the totality of the circumstances that would indicate a reasonable and articulable suspicion. *Grant,* 920 F.2d at 385.

When the officers approached defendant, their suspicion that he was engaged in criminal activity was based on the fact that defendant bought his ticket with cash shortly before embarking and his call back number was to an answering machine with a woman's voice. This is not enough to justify detaining him. *Cf. United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992) (information that defendant had paid $600 for train ticket in cash for one way ticket from Flagstaff to Kansas City and given Tucson area code phone number for reservation did not amount to reasonable or articulable suspicion).

In *Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980), the Supreme Court held that the suspect's arrival in the early morning, when law enforcement activity is diminished from a "drug source" city would not justify a finding of reasonable suspicion. The Court concluded that these facts "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* at 441, 100 S.Ct. at 2754. Many people may pay for bus tickets

in cash,[7] even close to departure time; and many people have a women's voice on their answering machines. If a seizure were allowed based on these facts, a large category of presumably innocent travelers would be subject to random seizure with little foundation to justify such a seizure. Quite simply, the reasons offered by the government for reasonable and articulable suspicion are not adequate reasons to restrict the defendant's freedom of movement. The totality of the circumstances in the present case, therefore, did not provide reasonable or articulable suspicion to justify seizure of the defendant.

The defendant's subsequent consent to the search of his carry-on bag did not overcome the taint of the officer's prior conduct. *United States v. Clardy,* 819 F.2d 670, 673 (6th Cir.1987); *United States v. Maragh,* 894 F.2d 415, 419–20 (D.C.Cir.1990). The "primary taint of the unlawful invasion" can only be purged when the defendant's consent is "the product of an intervening act of free will." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Here, as noted, the defendant consented, in all likelihood, because he was aware of the drug dog outside the bus. By detaining the defendant and putting him involuntarily to the choice between allowing the officer to search his bag or possibly having it checked by a dog, Sgt. Ellenwood successfully, but improperly, exploited the primary unlawfulness of the detention.

### Conclusion

For the foregoing reasons, it is hereby

**ORDERED THAT**: defendant's motion to suppress (Doc. 24) be, and hereby is granted.

**So ordered.**

---

7. Although the Supreme Court found it suspicious in *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), that defendant had paid for his ticket in cash, both the amount of cash involved and the totality of the circumstances in that case created reasonable and articulable suspicion: the defendant purchased a one-way ticket from Miami to Honolulu for $2,100 after spending only forty-eight hours in Miami. The government had also determined that he was traveling under a name which was different from his telephone listing.