**UNITED STATES of America,
Plaintiff,**

v.

**Elba CUEVAS–CEJA, Defendants.**

**No. CR–98–60147–AA.**

United States District Court,
D. Oregon.

May 14, 1999.

Kristine Olson, United States Attorney, William E. Fitzgerald, Assistant United States Attorney, Eugene, OR, for plaintiff.

Bryan E. Lessley, Assistant Federal Public Defender, Eugene, OR, for defendants.

## OPINION AND ORDER

AIKEN, District Judge.

Defendant Cuevas seeks suppression of all evidence and statements obtained as the result of a bus encounter initiated by law enforcement officers and the subsequent search of defendant's baggage. Cuevas claims that the bus encounter constituted an unlawful seizure under the Fourth Amendment, and therefore any evidence obtained as a result of the bus encounter must be suppressed as fruit of the illegal seizure.

The government objects to Cuevas's motion, claiming that the bus encounter was consensual and law enforcement officers obtained voluntary consent from Cuevas to search her baggage. Regardless, the government asserts that Cuevas does not have

standing to contest the search of her baggage because she abandoned it. Finally, the government maintains that any statements by Cuevas were made of her own volition.

On January 13, 14, and February 2, 1999, the court held consolidated evidentiary hearings on defendants' motions to dismiss in this case and in United States v. Lopez, No. CR–98–60143. The parties submitted supplemental briefing and the court heard oral argument on April 16, 1999. For the reasons given below, defendant's motion is granted.

## BACKGROUND FACTS [1]

### 1. Bus Interdiction Program

Roberto Davila owns Davila's Restaurant in Klamath Falls, Oregon, and works for Golden State Transportation (Golden State), a bus line which travels through Klamath Falls. Transcript of Proceedings (Tr.) 104, 110–111 (docs.39–41). In 1998, Davila was a ticket sales agent and the northwest supervisor in Oregon for Golden State. Tr. 111. Until the end of 1995, Davila held the same position with Frontera del Norte bus lines (Frontera). Tr. 111.

Davila's Restaurant is the site of a regularly-scheduled bus stopover for Golden State buses traveling from Los Angeles, California, to Yakima, Washington. When Davila worked for Frontera del Norte, those buses also stopped at the restaurant. Tr. 112. During the stops, the buses are cleaned, drivers are changed and the passengers rest, use the facilities and eat. Tr. 98, 112. The stops normally takes from forty-five minutes to one and one-half hours. Tr. 98, 112, 121.

In August of 1998, Davila communicated suspicions he had about two Golden State drivers and several passengers to Detective Greg Rote, a narcotics detective with the Klamath Falls Police Department. Tr. 113, 152. Davila has known Rote for about twenty years. Tr. 131. Apparently, Rote called Davila and asked general questions about the buses, and Davila relayed his concerns. Tr. 131–32. Davila told Rote that certain passengers were traveling from Los Angeles to Yakima as often as five or six times in one month. Tr. 113. Davila referred to these passengers as "frequent fliers." Tr. 116. Davila conceded that he did not know anything about those particular persons and had no reason for his suspicions other than the fact that they traveled frequently. Tr. 126. Davila conveyed similar suspicions to Rote about passengers of Frontera based on his observations in 1995. Tr. 130. Davila also suspected that two drivers were involved in some type of illegal activity. Tr. 113. In particular, Davila suspected one driver because he placed $7,000 in cash as a down payment on a vehicle another employee was selling and stated that he was interested in purchasing a home for $64,000 in cash. Tr. 113.

Rote asked Davila "what he thought," and Davila responded that he thought they had "some sort of situation here." Tr. 245. Davila did not provide Rote with any additional information about the passengers, and Rote did not did not ask about the identity, sex, or physical description of the passengers. Tr. 245–46.

Davila agreed to contact Rote the next time a bus with one of the suspected bus drivers or passengers was scheduled to stop in Klamath Falls. Tr. 114. On August 14, 1998, Davila called Rote at 10:05 a.m. and informed Rote that a bus had arrived at his restaurant and he believed a "frequent flier" or a suspected bus driver was on the bus. Tr. 115, 125, 168, 352. Rote and other officers arrived at the restaurant within minutes. Tr. 352. The officers searched the bus and seized approximately ten kilos of cocaine and 120 pounds of marijuana. Tr. 168. No arrests were made. Tr. 279. Agents from the Immigration and Naturalization Service participated in the first bus interdiction for interpretation purposes. Tr. 428.

Corporal Woody Pollock is a supervisor in the detective division of the Klamath

---

**1.** Except as otherwise noted, this section constitutes the court's findings of fact.

Falls police department. Tr. 426. Pollock participated in the planning of the bus encounters that occurred in August and September of 1998. Tr. 427. Prior to the first bus interdiction, Pollock had been advised that a Golden State bus was possibly transporting narcotics through Klamath Falls and was scheduled to stop at Davila's restaurant. Tr. 427. Pollock was informed that a large quantity of narcotics were seized from that bus, "and from that point forward it progressed into a series of encounters with buses from Golden State and with Frontera del Norte Bus Lines that were coming through our area." Tr. 427.

After the first encounter, Davila continued to call Rote about "frequent flier" passengers. Tr. 116. Approximately fifteen to twenty bus interdictions occurred, some initiated randomly and others initiated after receiving information that "frequent fliers" were on the buses. Tr. 169. Approximately nine of the bus encounters resulted in the seizure of illegal narcotics. Tr. 169. While most bus encounters occurred in Klamath Falls at Davila's Restaurant, a few took place in Madras, Oregon, and another in Chiloquin, Oregon. Tr. 170. Rote prepared no report documenting the origin of the bus interdiction programs, i.e., that Davila had noticed "frequent fliers" on the buses. Tr. 273.

Pollock held meetings to discuss procedures for the bus encounters, beginning after the first bus search on August 14th. Tr. 164, 428. Involved in the meetings were the Klamath Falls Police Department, the Oregon State Police, the Klamath County Sheriff's Department, the Immigration and Naturalization Service (INS) and the Drug Enforcement Agency (DEA). Tr. 428. Pollock also contacted the United States Attorney's office, the Oregon State Attorney General's Office and the district attorney for Klamath County. Tr. 166, 428. Pollock sought legal advice regarding the procedures to be used for bus encounters, because "we weren't sure how to handle that particular situation," i.e., repeated bus encounter involving numerous passengers. Tr. 429–30.

Pollock developed a set of guidelines to establish a uniform bus interdiction process and distributed the guidelines to the city police department and the county drug team. Tr. 165, 167, 505. Pollock wrote the guidelines on or about August 19,.close in time to the second or third bus encounter. Tr. 166, 489. The guidelines were in the form of a memorandum to all drug team members, but the document was not considered an "official memorandum" under Klamath Falls Police Department policy. Tr. 489–90. In other words, rather than official policy, the guidelines were considered an informal informational sheet or checklist. Tr. 490–91. Pollock did not consult anyone in preparing the guidelines, although he relied on his previous communications with prosecutorial agencies. Tr. 492. Pollock decided to write the guidelines "because it was getting confusing as to what should and should not be done on certain—not certain, but all interdictions, because this was entirely new to us." Tr. 492.

Although Pollock received advice from prosecutors that passengers should be told they were free to leave, Pollock did not include that instruction in the guidelines. Tr. 493, 500; Government Exhibit S–15.[2]

2. The guidelines included the following instructions:

1. Photograph the bus as it pulls into the search location and document the date and time of arrival of the bus.
2. If the search location is an authorized bus station, obtain written consent from the station manager to search the entire bus for possible illegal drugs or suspect items or persons.
3. Obtain written consent from the bus driver or drivers, if more than one driver, to enter the bus and conduct a search for illegal drugs or suspect items or persons.
4. Obtain written consent from each passenger to search their luggage, both carry on and checked luggage. We should also obtain consent to search their person at this time (pockets wallets etc.) for evidence of checked baggage such as claim tickets. In the event that the passenger is of Hispanic decent [sic], the consent form should be printed in Spanish for them to read.

During the evidentiary hearing, however, the government presented a copy of the guidelines that included a handwritten instruction numbered "3a." Under guideline 3a, officers were instructed to "Tell all persons on bus that they are free to leave (unless INS present.)." Government Exhibit S–13. Pollock testified that he had no idea who wrote the handwritten instruction 3a. Tr. 494. The first time Pollock saw the altered guidelines was in court on January 14 and had no idea when the modification was made. Tr. 494. Pollock typed and printed out the guidelines on his computer, copied and personally distributed them to other officers. Tr. 505–06. Thus, the copies of the guidelines distributed to other officers did not include the handwritten guideline under 3a, and no officer received written instructions that passengers should be told that they were free to leave the bus. Tr. 506.

> 5. After all consent has been given and consent forms have been signed, a seating chart should be made indicating where each passenger was seated.
> 6. Have each individual passenger identify any carry on luggage they might have with them, and ask if they have any checked luggage.
> 7. Have each individual passenger furnish their bus receipt and baggage claim ticket if they have one.
> 8. Compare the bus receipt with the bus manifest held by the driver and station manager.
> 9. Search all carry on luggage.
> 10. Pull all luggage from the luggage compartment of the bus and set it on the ground outside of the bus in a single line with a space of about 3 feet between each piece.
> 11. Have all passengers identify their checked luggage from inside the bus.
> 12. Use a drug-sniffing dog if one is available to sniff the luggage for suspected illegal drugs.
> 13. Match the claim tags on the luggage with the claim tags of the passengers if possible.
> 14. Have one officer check each bag individually paying particular attention to any unclaimed or untagged luggage. (Ensure that proper search techniques are followed).
> 15. If any large quantity of illegal drugs are located during any part of the search, Polaroid photos should be taken of each per-

Prior to each bus encounter, Pollock held briefings with the officers involved in that particular encounter. Tr. 474. During the briefings, Pollock did not read, describe or discuss each guideline. Tr. 474, 476–82. Rather, Pollock assigned officers to certain tasks included in the guidelines and instructed officers to issue a verbal consent warning. Tr. 475. Pollock testified that he advised the officers to stay out of the aisle and cover their weapons and their badges.

Pollock also testified that he instructed interpreters to inform passengers that they were free to leave. Tr. 483, 475. However, some interpreters did not attend the briefings. Tr. 479, 482–83. Further, Pollock did not participate in the bus searches. Tr. 501. Instead, Pollock occasionally boarded buses to check on the progression of the consents and the search. Tr. 501. Thus, Pollock did not

> son on the bus. The name of the person and their seating location should be noted on the photo.
> 16. A photographer should be assigned to photograph any pertinent items, or any aspect of the investigation deemed necessary by the case agent. The photographer should keep a photo log to track the sequence of the photos for later courtroom testimony.
> 17. If the case is going to be turned over to D.E.A. all evidence will be seized and property receipts given to the individuals it was seized from. The evidence will be transported to the City Police Dept. and secured until turned over to D.E.A.
> 18. If the case is not going to be given to D.E.A. all evidence will be processed in accordance with K.F.P.D. policy.

Government Exhibit S–15. Pollock testified that several of the guidelines were not read or discussed at every briefing, including numbers 1, 2, 3, 4, 10, 11, 12, 13, 14, 15, 16 and 18. With respect to guideline numbers 5, 6, 7, 8, and 9, Pollock assigned an officer to the specific duty identified by the guideline, although Pollock did not otherwise explain guideline. Pollock himself covered guideline number 17. Tr. 476–482.

Pollock testified that the consent forms signed by the drivers do not give consent to search the bus, only to search the individual bag, which does not conform with guideline 3. Tr. 497–98. Pollock admitted that guideline 3 was never followed. Tr. 499.

hear announcements made to the passengers and did not know whether passengers were told that they could leave the bus at any time. Tr. 501.

Francisco Gonzalez is part-owner of Golden State Transportation. His family owns forty-nine percent and Greyhound owns fifty-one percent. Tr. 97. In August of 1998, Gonzalez traveled from Los Angeles to Klamath Falls after receiving a telephone call from Davila. Tr. 105. Once in Klamath Falls, Gonzalez accompanied Davila to the police station to answer questions and sign a consent form authorizing law enforcement to search Golden State buses. Tr. 99, 106. Pollock drafted the consent agreement during a conversation with Gonzalez at the police department after a Golden State bus was found with drugs on board. Tr. 431.

The consent agreement purportedly gave law enforcement the authority to search the bus, all passengers, and all luggage on the bus. Tr. 289; Defense Exhibit 2. Gonzalez agreed to the searches because buses had been searched already and Gonzalez felt that time was being wasted for other passengers. Tr. 100. Gonzalez also agreed to the searches to show that Golden State was cooperating with law enforcement efforts. Tr. 100, 286. Gonzalez signed the consent form on August 26, after contacting his son, the president of Golden State Transportation. Tr. 289–87, 432. Pollock decided to put the agreement in writing because he thought everything associated with the bus interdiction program should be documented. Tr. 432. Pollock thought about entering into the same type of agreement with Frontera, but he never contacted anyone from that company. Tr. 433.

According to Rote, the following procedures were generally followed during each bus interdiction: 1) police contacted the bus drivers and informed the bus drivers that they were law enforcement agents; 2) the officers told the drivers their purpose for boarding the bus; and 3) the officers asked for consent to board the bus and obtained consent to search the bus and approach the passengers. Tr. 171–72. Then, an interpreter would "contact the passengers, advise them who we were, advise them what we were looking for, and then read a consent form to them." Tr. 172. Rote provided the consent form that advised the passengers of their rights, including the right to refuse consent, and asked the interpreter to read the consent form verbatim to the passengers.[3] Tr. 174. Rote assumed that the Spanish speaker followed those instructions. Tr. 175. Rote does not understand Spanish. Tr. 175.

Rote testified that the officers "would have the passengers give us a verbal or visual that they would agree for us to come on the bus and to search, and we would check with these passengers if they said yes, and then at that point we could go down the line, and we would obtain written consent from each passenger, and we would chart the bus." Tr. 172. Rote testified that he would approach each passenger with a copy of the consent form, ask for the passenger's identification, write down the passenger's name and request that the passenger sign the consent form. Tr. 177. Rote did not always fill in the lines on the consent form, but he "would put it directly under" the passenger after obtaining consent and move on to the next

---

**3.** The consent form read as follows:
NOTICE
1. You have the right to refuse to consent to a search.
2. If you refuse, your refusal cannot be used against you for any purpose.
3. Any evidence of a crime and anything subject to civil forfeiture may be seized.
CONSENT (Motor Vehicles)
I voluntarily consent to the search of my motor vehicle and its contents. I voluntarily consent to the seizure and analysis of evidence of any crime and to the seizure of anything subject to civil forfeiture.
No threats or promises have been made by any person to make me give this consent.
The form followed with the same notice and consent written in Spanish.
For passengers, the words "motor vehicles and its contents" were changed to "person and luggage." Tr. 238.

passenger. Tr. 414. Rote asserted that the same procedures were implemented in all bus interdictions. Tr. 174. However, in some cases, there were fewer consent forms with signatures of passengers than the number of passengers actually identified on the seating charts. Tr. 293.

During the encounters, all officers wore street clothes, concealed their badges and guns and used calm and polite tones of voice. Tr. 181–82. Translators were utilized and on two occasions a police narcotics canine was present. Tr. 182. The narcotics canine sniffed the luggage in the luggage compartment located in the cavity of the bus, and on one occasion, the carry-on luggage. Tr. 182. The canine was not employed until consent to search was obtained from every passenger on the bus. Tr. 183, 638. The passengers remained seated while the officers used the dog to sniff the checked luggage outside the bus. Tr. 183, 638.

2. *August 30, 1998*

Deputy Sheriff Audeliz Lugo of the Klamath County Sheriff's Office participated in a bus encounter on August 30, 1998, in Klamath Falls. Tr. 553. On that day, he reported for work at the city police department and waited with other officers until the bus was scheduled to arrive. Tr. 556. Lugo received verbal instructions regarding procedures and the encounter from Rote; Lugo could not recall being given written instructions. Tr. 557.

Elio Gomez and Alfredo Ortiz are bus drivers for Golden State. Tr. 60.[4] On August 30, 1998, they drove the bus into Klamath Falls for a regularly-scheduled stop at Davila's Restaurant. Tr. 60–61, 79. Ortiz was driving the bus and Gomez was the passenger driver. Tr. 61, 79. When the bus pulled up at Davila's Restaurant, officers were waiting for the bus. Tr. 62, 79, 557. As Ortiz opened the bus door,

Rote and Lugo boarded the bus and asked the drivers for permission to search the bus and their bags. Tr. 58, 62, 79–80, 557. One officer asked Gomez to sign an authorization form to allow the search of the baggage on the bus. Tr. 63–64.

Rote and Lugo stated that they were policemen and not with the immigration service, and that they were going to search the bus and the passengers if given permission to do so. Tr. 65, 80. The officers spoke to the drivers and the passengers collectively in Spanish. Tr. 80. At some point, one or two additional officers boarded the bus and walked to the rear of the bus. Tr. 62, 63, 79, 360–61.[5]

The drivers did not object and offered to let Lugo use the speaker system to make an announcement, but Lugo declined. Tr. 67, 81, 558. Lugo read the consent form verbatim and asked passengers to raise their hands if they understood and agreed to the consent. Tr. 66, 559. Lugo testified that he said nothing else to the passengers as a group before contacting them individually. Tr. 559. Lugo would then "ask each individual if they understood, and then go on and ask for the—their identification their, ID card, and their tickets." Tr. 540, 542. Once Lugo received the items, he passed them on to Rote, who passed them to another officer preparing the seating chart. Tr. 360–61, 541, 560. The passengers were questioned from front to rear. Tr. 551–52, 553. On one or two occasions, an officer would take a bag from the overhead compartment and ask a passenger whether it belonged to that passenger. Tr. 68, 85, 560.

Gomez and Ortiz testified that the officers stated that no one was to leave the bus, including the drivers. Tr. 66, 81. Gomez testified that he did not see the officers distribute consent to search forms to the passengers. Tr. 68. Ortiz did not

---

4. Davila suspected neither Gomez nor Ortiz. Tr. 125.

5. The testimony is confusing as to when, where and how many officers were on the bus. However, reading all of the testimony as

a whole, the court finds that Rote and Lugo first boarded the bus, and while Lugo was reading the consent forms to the passengers, one or two additional officers boarded the bus and walked to the rear.

sign a consent to search form and testified that he saw no other passenger sign such a form. Tr. 84, 90. When asked whether the luggage was searched before the passengers signed consent forms, Gomez answered, "the passengers didn't sign anything." Tr. 75.

When finished inside, the officers left the bus to search the luggage located in the baggage compartment under the bus. Tr. 69–70. According to Gomez and Ortiz, they and the passengers did not leave the bus because they had not received the order that they could do so. Tr. 70, 83–84. The passengers remained on the bus while the officers removed baggage from the luggage compartment. Tr. 70–71. The officers then directed the passengers to claim their bags. Tr. 70, 84, 87, 253. The passengers were not told that they were not required to claim their luggage. Tr. 71, 87.

One bag was not identified. Tr. 253. The bag was searched and found to contain drugs. Tr. 253–54. The claim ticket on the bag included a passenger ticket number which conformed to the information provided by Cuevas. Tr. 254. Officers found a letter addressed to "Ben Valencia" in the bag; however, the letter did not have Cuevas's name on it. Tr. 256, 266, 355–56. Deputy Lugo approached Cuevas and questioned her about the bag. Tr. 254. Cuevas was eventually arrested for possession of drugs based on the fact that the claim ticket on the bag with drugs matched her passenger ticket. Tr. 254.

Lugo conducted an interview of Cuevas with Rote at the Klamath Falls police station. Tr. 255, 554. Lugo read a rights advisement, and Cuevas indicated that she understood her rights and proceeded to answer questions. Tr. 225, 554. During the interview, Cuevas stated that she did not know what was in the bag. Tr. 256. Cuevas also denied knowing Valencia. Tr. 256, 366. While interviewing her, the police asked for consent to search her purse. Tr. 355–56. Officers found an address book in Cuevas's purse which contained the name of Valencia. Tr. 366. Later,

Cuevas admitted that she had a relationship with Valencia and agreed to make a telephone call. Tr. 257.

The stop at Davila's Restaurant lasted one-half hour longer than its usual stop. Tr. 72, 89–90.

### DISCUSSION

#### 1. Equal Protection

Cuevas argues the government violated her rights under the Equal Protection Clause of the Fourteenth Amendment by targeting Hispanic passengers for investigation of narcotics trafficking. The government responds that no equal protection violation was committed because race was not the sole motivating factor underlying the decision to commence the bus interdictions.

■ The court construes defendant's equal protection argument as a motion to dismiss rather than a motion to suppress. Suppression of evidence pursuant to the exclusionary rule is normally a remedy for violations of the Fourth Amendment. *United States v. Travis*, 62 F.3d 170, 174 (6th Cir.1995), *cert. den.*, 516 U.S. 1060, 116 S.Ct. 738, 133 L.Ed.2d 688 (1996). Presumably, if the bus passengers were targeted for investigation based solely on their race or ethnicity, the indictment returned against Cuevas is constitutionally flawed and must be dismissed.

■ Caselaw discussing equal protection in terms of investigatory tactics, as opposed to prosecutory actions, is sparse. However, the standard governing selective prosecution is easily applied to the claim of selective investigation: 1) others generally are not investigated for the same conduct; and 2) the decision to investigate the defendant was based on the impermissible ground of race or ethnicity. *Church of Scientology v. Commissioner of Internal Revenue*, 823 F.2d 1310, 1321 (9th Cir. 1987), *cert. den.*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (citing *Karme v. Commissioner*, 673 F.2d 1062,

1064 (9th Cir.1982)); *United States v. Avery*, 137 F.3d 343, 358 (6th Cir.1997). A defendant must demonstrate by a preponderance of the evidence that police initiated an investigation because of race. *Avery*, 137 F.3d at 355. It is not disputed that no other buses were investigated or searched. Tr. 218–19. The only question is whether the decision to investigate and search Golden State buses was based solely on the race of the passengers.

In *United States v. Travis*, a law enforcement officer focused on an airline passenger because of the name on the passenger list, "Angel Chavez." 62 F.3d at 172. Upon further investigation, the officer learned that the passenger had purchased a one-way ticket from Los Angeles to Cleveland with cash five hours before the flight. *Id.* at 172. Based on his experience, the officer believed that drug couriers commonly purchased airline tickets with cash shortly before departure. *Id.* As the passengers disembarked and entered the terminal, the officer approached two women, both African–American and the only women unaccompanied. *Id.* at 173. One woman was questioned and left. The other woman stated her name was Angela Chavez and indicated that her name was misspelled on the ticket. However, the woman's identification listed her name as Angela Travis. *Id.* The officer informed defendant that he was looking for narcotics and requested permission to search her bags, and the defendant consented. *Id.* Narcotics were found and defendant was arrested.

On appeal, the issue was whether the officer selected the defendant for a consensual encounter solely based on race. Although the court found that consensual searches may violate the Equal Protection Clause when initiated solely because of race, it declined to find such a violation. *Id.* at 173–74. "In some instances, officers may decide to interview a suspect for many reasons, some of which are legitimate and some of which may be based on race. In such instances ... the use of race in pre-contact stage does not give rise to any constitutional protections." *Id.* at

174. Because the court found that the officer had compiled several reasons for initiating the encounter with the defendant, some of which were legitimate, no equal protection violation occurred. *Id.* at 174–75. The same is true in this case.

■ Although Rote testified that Davila called him and he did not call Davila, the court finds it more probable that Rote called Davila. Tr. 153. It is unlikely that Davila suddenly felt inspired to call Rote to provide such general and somewhat stale suspicions. Regardless, the court cannot find that Rote's decision to call Davila was based solely on the fact that the bus line for which Davila worked catered to Hispanic passengers. Cuevas presented no evidence suggesting that fact or that Rote investigated only Hispanics.

Furthermore, Rote has been a narcotics detective for five years and has been involved in over 200 cases. From his experience, narcotics coming into Klamath Falls originate in either Northern or Southern California. Tr. 156. Rote stated that he was familiar with some of the routes of Frontera del Norte and Golden State. Tr. 154. Rote knew that Golden State leaves Los Angeles and travels through the night, picking up passengers along the way. Tr. 155. Rote testified that "[r]ace had nothing to do with the drugs that were being trafficked." "It was a pipeline. It had nothing to do with race." Tr. 159. The "pipeline" to which Rote referred was the route used by drug traffickers to transport drugs through Oregon. Tr. 159. Thus, Rote's decision to contact Davila likely resulted from Rote's twenty-year acquaintance with Davila and his belief that buses from the Los Angeles area were possible modes of transporting drugs.

Cuevas emphasizes that neither Rote nor any other officer attempted to initiate interdictions of other bus lines, such as Greyhound, which presumably cater to a more diverse mix of passengers. Thus, because only Golden State and Frontera bus lines were targeted and their passengers base is almost exclusively Hispanic,

Cuevas argues that the only reasonable explanation for targeting those buses rather than Greyhound is the fact that the passengers are Hispanic.

The court might agree if Pollock and Rote, on nothing more than a whim, initiated the bus interdiction program. However, Rote received information from Davila that Golden State and Frontera had "frequent flier" passengers who traveled multiple times per months, and that Davila felt that narcotics trafficking might be occurring. Tr. 152–53, 275. Cuevas argues that this basis is insufficient because Rote possessed no other information regarding Golden State or Frontera. Tr. 153, 370. Regardless of whether the information from Davila was a reasonable justification for treating bus passengers as possible drug traffickers and subjecting them to intrusive questioning and searches, the fact that Davila suspected Golden State drivers and passengers of transporting narcotics is a race-neutral reason for initiating bus interdictions.

True, Rote testified that he did not know the ethnicity of the passengers until he had boarded each bus, a statement that stretches the bounds of credulity. Tr. 276, 405. Although Rote did not ask Davila about the ethnicity of Golden State passengers, Rote has spent time around Davila's Restaurant, has seen passengers of Golden State, and would have known that about ninety percent of Golden State passengers were Hispanic. Tr. 132–33. Moreover, it is unlikely that the presence of interpreters at each and every bus encounter was sheer serendipity rather than the conscious decision of law enforcement officers. Nevertheless, the presence of interpreters and Rote's familiarity with Golden State and Frontera passengers shows nothing more than an awareness that the passengers were Hispanic. Such evidence does not establish that the decision to initiate bus interdictions was based solely on the race or ethnicity of the passengers.

In *United States v. Avery,* 137 F.3d 343 (6th Cir.1997), the Sixth Circuit found that officers' decision to investigate the defendant, a young African–American male, in an airport did not violate the Equal Protection Clause. The officer claimed that they investigated defendant because he: 1) was in a hurry; 2) appeared focused and looked straight ahead; 3) was attired in a sweatshirt with short sleeves in the winter; 5) carried an gym-type carry on bag; and 5) sat in an empty row of seats near the podium in the airline terminal. *Id.* The court found that the officer's reasons for the investigation were race neutral. *Id.* at 358.

If such innocuous behavior suffices to defeat an allegation of selective investigation, surely the decision to initiate bus encounter based on information that suggests some passengers may be engaging in illegal activity must do the same. Based on the record and the testimony presented, the court does not find that the bus interdiction program was initiated solely on the basis of race.

### 2. Unlawful Seizure

Cuevas claims that the bus encounter on August 30 constituted an unlawful seizure of her person. Cuevas argues that the government fails to show that the encounters were consensual, because the passengers were not told that they were free to leave the bus and instead were told that they must remain seated. Further, Cuevas maintains that the testimony of Rote, Pollock and Lugo establish that the guidelines and procedures were not followed by the law enforcement teams and a reasonable person would not have felt free to decline the officers' requests.

The government counters that the passengers were informed that they could refuse to consent to a search of their bags and the officers did not engage in any coercive behavior. The government emphasizes that the officers obtained written consent from the passengers prior to searching their baggage. Additionally, the government argues that the relevant inquiry is *not* whether the passengers were told that they could leave the bus at any time,

pursuant to the Supreme Court ruling in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

 A seizure occurs when a law enforcement officer restrains the liberty of a person by either physical force or a show of authority. *United States v. Chan–Jimenez,* 125 F.3d 1324, 1326 (9th Cir.1997); *Orhorhaghe v. Immigration and Naturalization Service,* 38 F.3d 488, 495 (9th Cir. 1994). Such restraint does not violate the Fourth Amendment if supported by either probable cause or reasonable suspicion that the person is engaging or about to engage in illegal activity. *See Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

 It is undisputed that neither Rote nor any other officer possessed reasonable suspicion or probable cause to believe that anyone on the bus was engaging or about to engage in illegal activity. Accordingly, the validity of the encounter depends on the purported consensual nature of the encounter. *Id.* at 497, 103 S.Ct. 1319. Where the validity of a seizure and search rests on consent, the government bears the burden of proving that the consent was freely and voluntarily given, "a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Id.*

 In *Florida v. Bostick,* the Supreme Court rejected a per se rule that all bus interdictions initiated by law enforcement are unconstitutional seizures. 501 U.S. at 435–36, 111 S.Ct. 2382. Consequently, police officers do not violate the Fourth Amendment by approaching bus passengers, asking for identification and consent to search baggage, "as long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437, 111 S.Ct. 2382; *United States v. Gonzales,* 979 F.2d 711, 713 (9th Cir.1992). In order to find that a person did not consent to an encounter with police officers, a defendant must show that "the officer's show of authority, in combination with other circumstances, is objectively so intimidating that an individual could reasonably believe that he was not free to disregard the police presence and go about his business." *Id.* (internal quotations and citation omitted). The test of whether a person felt free to disregard police requests is an objective standard; the subjective beliefs of the person contacted is irrelevant to the question of whether a seizure occurred. *United States v. Little,* 60 F.3d 708, 710 (10th Cir.1995); *United States v. Winston,* 892 F.2d 112, 115–16 (D.C.Cir.1989); *see also People of the Territory of Guam v. Palomo,* 35 F.3d 368, 375 (9th Cir.1994), *cert. den.,* 513 U.S. 1089, 115 S.Ct. 750, 130 L.Ed.2d 650 (1995).

 In determining whether the bus encounters were unlawful seizures, the court "must consider all the circumstances surrounding the encounter." *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382. In addition to whether the encounter took place in "the cramped confines of a bus," factors deemed relevant to the inquiry include the officer's tone of voice, whether the officer displayed a weapon, wore a uniform, touched the individual without permission, threatened or physically intimidated the passenger, retained identification or travel tickets or told the passengers that consent may be refused. *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382; *United States v. Lewis,* 921 F.2d 1294, 1297 (D.C.Cir.1990); *Gonzales,* 979 F.2d at 713. The mere presence of a law enforcement officer does not constitute the "show of authority" necessary to find that a person would not feel free to leave. *Winston,* 892 F.2d at 116.

The parties disagree whether the court's inquiry should include whether the officers informed passengers that they were free to leave the bus. The Supreme Court and the Ninth Circuit have held that this factor normally is not relevant: "The appropriate inquiry is not whether the passenger would feel free to leave, since a person *seeking to travel somewhere on a bus* does not ordinarily wish to leave the bus." *Gonzales,* 979 F.2d at 713 (emphasis added); *see also Bostick,* 501 U.S. at 435, 111

S.Ct. 2382. However, the rulings in *Bostick* and *Gonzales* are premised on the assumption that "when [a] person is seated on a bus and has no desire to leave, the degree to which a reasonable person would not feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Bostick*, 501 U.S. at 435–36, 111 S.Ct. 2382; *see also Gonzales*, 979 F.2d at 713. In that situation, factors "independent of police conduct 'i.e., by [them] being [passengers] on a bus,' restrict the passengers' freedom of movement." *Bostick*, 501 U.S. at 436, 111 S.Ct. 2382. The question thus becomes whether Cuevas would "have felt free to leave the bus even if the police had not been present." *Id.*

The bus on which Cuevas was traveling stopped at Davila's Restaurant *for the purpose of letting the passengers off the bus.* Therefore, unlike *Gonzales* and *Bostick*, where the passengers did not intend to leave the bus at the time the officer boarded, the Golden State passengers were preparing to leave the bus when the officers boarded. *Bostick*, 501 U.S. at 435, 111 S.Ct. 2382; *Gonzales*, 979 F.2d at 712–13. The most recent stop was twelve hours earlier, and the bus was stopping for a meal break. Tr. 61, 79, 307. The passengers were preparing to leave as law enforcement officers boarded the bus, asked for their attention, and informed the passengers that the officers would be conducting a search of their luggage and person. The officers conduct clearly interrupted the passengers. Therefore, whether the passengers were told they were free to leave the bus is a relevant factor. "Although an officer's failure to advise a citizen of his freedom to walk away is not dispositive of the question of whether the citizen knew he was free to go, it is another significant indicator of what that citizen reasonably believed." *Morgan v. Woessner*, 997 F.2d 1244, 1254 n.5 (9th Cir.1993), *cert. den.*, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). The record clearly establishes that the passengers were not so informed.

The original guidelines Pollock drafted for the officers did not instruct officers to tell the passengers that they were free to leave the bus at any time. Tr. 434, 500. Pollock testified that he nevertheless communicated this instruction orally during briefings that occurred prior to any bus encounter. Tr. 436. However, Lugo received all of his instruction from Rote and he was told only to read the consent form, which did not include any statement about being free to leave the bus. Tr. 557, 612. Thus, Cuevas and the other passengers were not informed that they were free to leave the bus at any time. This fact, although significant, is not dispositive.

Upon the arrival of the bus at Davila's, officers immediately boarded the bus and, after conferring with the drivers, announced that they were conducting a search. Tr. 62, 79, 557. The officers did not wait until the passengers had finished their meal break, nor did the officers approach each passenger quietly and unobtrusively. *See United States v. Rembert*, 694 F.Supp. 163, 173 (W.D.N.C.1988) (officers waited 30–40 minutes to allow passengers to "utilize restrooms and get refreshments" and reboard bus). Instead, several officers boarded a bus as passengers were preparing to leave, interrupted the passengers, and informed them that a search would be conducted. The purpose of the officers' actions was to prevent passengers from exiting the bus until the officers had "obtained" consent to search the passengers' baggage. Without question, the "unambiguous message [was] that the attention and cooperation of all passengers [was] required." *United States v. Guapi*, 144 F.3d 1393, 1396 (11th Cir.1998).

In additional to Rote and Lugo, one or two additional officers entered the bus and stood guard at the rear of the bus and another officer assisted with the seating chart. Tr. 62–63, 79, 360–61. Thus, three officers questioned the passengers on the bus with two officers stationed at the rear of the bus, while additional officers stood outside the bus. When questioning each

passenger, the officers stood in front of the passenger, blocking the aisle to the exit. Tr. 83. If a passenger had decided to decline the officer's requests and leave the bus, the passenger would have had to physically confront three law enforcement officers. Tr. 83. Thus, the officers effectively prevented the passengers, including Cuevas, from leaving their seats or moving to another part of the bus until the officers questioned everyone. *See Guapi,* 144 F.3d at 1396; *Gonzales,* 979 F.2d at 713. The fact that the questioning began in the front of the bus, rather than the rear, also conveyed the message that passengers were required to cooperate. Tr. 551–53. *Guapi,* 144 F.3d at 1396; *United States v. Fields,* 909 F.2d 470, 471–72, 474 (11th Cir.1990) (no unlawful seizure when officers went to rear of bus, approached defendant and requested consent, emphasizing that search was voluntary).

Additionally, after Lugo requested identification and bus and claim tickets, the items were passed to Rote and another officer. Tr. 360–61. *See United States v. Perez,* 37 F.3d 510, 515 (9th Cir.1994) (in finding consent to search vehicle voluntary, court noted that officer was not in possession of driver's belongings); *see also Chan–Jimenez,* 125 F.3d at 1326 (seizure when officer takes possession of identification papers longer than necessary). After the officers obtained identification and bus and claim tickets, each passenger remained seated. Tr. 70–71. The passengers did not leave the bus until the carry-on items were searched and the passengers were directed to claim checked baggage. Tr. 70–71, 87. All of these facts support the finding that the passengers believed their cooperation was required.

Finally, neither driver of the bus believed that they or any passenger could leave the bus without permission from the officers. While the subjective belief of the drivers is not dispositive, it is relevant to what a reasonable person would have believed under those circumstances.[6] *Guapi,* 144 F.3d at 1397.

In *Guapi,* the Eleventh Circuit found the warrantless search carry-on luggage of bus passengers was unconstitutional because the passengers' consent to search was not uncoerced or voluntary. *Id.* at 1393. A Greyhound bus was stopping at a terminal for a layover, and the driver informed the passengers that they would be required to exit the bus. *Id.* Officers then boarded the bus and informed passengers that they were going to check carry-on luggage for narcotics and other illegal items "with your consent and cooperation." *Id.* at 1394. The passengers were not informed that they could refuse to consent to the search. *Id.* The court found that the only reason the passengers did not leave the bus was because the exit was obstructed by police officers. *Id.* at 1396. The court also emphasized that the officers essentially interrupted the passengers' activities when they boarded the bus and made an announcement, finding such conduct coercive and intimidating. *Id.* The court also found the manner in which the search was conducted—from front to rear, with an officer near the drivers' seat—would lead a reasonable person to believe that they were not free to disregard the officers' request. *Id.* at 1394.

The only real distinction between this case and *Guapi* is the fact that Lugo read the passengers the consent form, which included a warning that passengers had the right to refuse consent to search their bags. However, such an advisement would not have been understood by the passengers as permission to leave the bus before being questioned by police. By the

---

6. The government presented testimony from Davila that Ortiz greeted Davila at the courthouse after testifying and told Davila that he that he no longer worked for Golden State. One week later, Davila saw Ortiz driving a bus. Ortiz told him that "when you testify for the boss, you get your job back." Tr. 535.

The government presented such testimony in an effort to impeach Ortiz's credibility, arguing that it shows Ortiz was rewarded for testifying. Gonzalez rebutted this allegation. Tr. 564–565. Regardless, the court finds any such inference completely speculative and will not consider it.

time that warning was provided, the passengers had been given the impression that their attention and cooperation was required. Even a brief detention is impermissible under the Fourth Amendment absent objective, reasonable grounds for doing so. *United States v. Barrett,* 976 F.Supp. 1105, 1109 (N.D.Ohio 1997), *citing Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

■ Moreover, the fact that the officers may have told the passengers that they could refuse consent does not purge the taint of the unlawful seizure, given the totality of circumstances surrounding the bus encounter. The failure to inform passengers that consent may be refused does not render an encounter unlawful, per se, where the official conduct indicates that compliance is voluntary. *Gonzales,* 979 F.2d at 713; *United States v. Doyle,* 129 F.3d 1372, 1377 (10th Cir.1997). Likewise, informing passengers that consent may be refused should not render an encounter lawful, per se, if the official conduct otherwise conveys the message that compliance is required. *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382 (court must take into account "all of the circumstances surrounding the encounter"); *cf. United States v. Little,* 60 F.3d 708, 713–14 (10th Cir.1995) (illegal seizure found when officer asked train passenger to accompany officer to baggage area after the passenger refused to give consent to search her bag; officer did not inform passenger she was free to disregard the latter request).

■ The court finds that the encounter, whether by accident or design, aggravated and exploited the "cramped confines" of the bus. No passenger would have reasonably believed that the encounter and ensuing search "could proceed only if consent was given." *United States v. Washington,* 151 F.3d 1354, 1356 (11th Cir. 1998). Accordingly, Cuevas was seized unlawfully.

*3. Consent*

■ The government argues that Cuevas nonetheless voluntarily consented to a search of her baggage. Notwithstanding the illegality of a seizure, a search may be lawful if it is pursuant to a valid consent. *Chan–Jimenez,* 125 F.3d at 1326. However, "[t]he taint of an unlawful seizure can only be purged when consent is 'the intervening act of free will.'" *Barrett,* 976 F.Supp. at 1109, *quoting Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In order to establish a valid consent to search, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." *Id.* at 1327; *United States v. Licata,* 761 F.2d 537, 544 (9th Cir.1985) (government bears burden of proving consent was freely and voluntarily given).

■ Whether consent was voluntary depends on "the totality of the circumstances" and is a question of fact. *United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995), *cert. den.,* 516 U.S. 1152, 116 S.Ct. 1030, 134 L.Ed.2d 108 (1996). "A person's obedience to a show of authority is by itself insufficient to establish voluntary consent." *Chan–Jimenez,* 125 F.3d at 1328. Factors to be considered include whether the person was detained, whether the officer had a weapon drawn, whether the officer administered *Miranda* warnings, whether the officer informed the person of the right to refuse consent, and whether the person was told that a search warrant could be obtained. *Id.* at 1327. Although these factors may aid in the determination of consent, "the full richness of any encounter must be considered by the district court." *Morning,* 64 F.3d 531.

Cuevas' consent form identifies Rote as a witness; it is the one consent form on which Rote signed his name as a witness. Tr. 363. Rote testified that he did not always sign his name "to make things faster," but that he obtained the written consent on every single bus. Tr. 363. Rote conceded that he may have signed his name to Cuevas' consent after they suspected she was transporting drugs. Tr. 364. Cuevas' consent form also indicates

that Lugo was the translator and was the only form containing the name of the translator. Tr. 364. However, Lugo testified that he did not write his name as it appears on the consent form of Cuevas. Tr. 561; Defense Exhibit 21. Furthermore, Lugo did not testify that he obtained consent forms from any passengers. Therefore, the court cannot find that Cuevas signed a consent form prior to the search of her bag.

■ Moreover, Cuevas was seized unlawfully and full *Miranda* warnings were not given prior to the request for consent. Even though Lugo informed the passengers that they could refuse to consent, for all of the reasons explained above, the conduct of the officers negated that advisement and conveyed the message that consent was required. As a result, Cuevas's consent to search her baggage was involuntary.

### 4. Abandonment

The government argues that Cuevas lacks standing to contest the search of her checked luggage because she abandoned it by failing to claim her luggage when directed to do so by police. Cuevas counters that she did not abandon her bag, and even if she did, the abandonment was the result of the unlawful seizure and cannot be relied upon by the government.

■ A person who voluntarily abandons property lacks standing to contest its search or seizure, because warrantless searches or seizures of abandoned property do not violate the Fourth Amendment. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir.1986). The issue is whether "through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id.* Courts have held repeatedly that an abandonment occurs when a defendant explicitly denies ownership of baggage or physically relinquishes control over the baggage so as to relinquish possessory interest in it. *Gonzales*, 979 F.2d at 714; *Nordling*, 804 F.2d at 1469–70; *see*

*also United States v. Porter*, 107 F.3d 582, 584 (8th Cir.1997); *United States v. Austin*, 66 F.3d 1115, 1119 (10th Cir.1995), *cert. den.*, 516 U.S. 1084, 116 S.Ct. 799, 133 L.Ed.2d 747 (1996) (defendant did not retain objectively reasonable right of privacy when luggage entrusted to a stranger at airport). However, "[a]n abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary." *Austin*, 66 F.3d at 1118; *United States v. Garzon*, 119 F.3d 1446, 1451 (10th Cir.1997) ("Abandonment will not be recognized when it is the result of prior illegal police conduct."); *but see United States v. Jones*, 914 F.Supp. 421, 423 (D.Colo.1996), *aff'd*, 124 F.3d 218 (10th Cir.1997) (abandonment voluntary when passenger exiting bus left bag after being informed narcotics dog would be outside and that passengers should exit bus "in normal fashion").

■ Cuevas did not explicitly deny ownership of her baggage; she simply did not claim the baggage when directed to do so by officers. Thus, Cuevas did "nothing to manifest objectively an intent to abandon" her baggage. *Garzon*, 119 F.3d at 1450. Because the passengers were not required to consent to the officers' requests, the government cannot now construe what could be a refusal to comply as an abandonment. "One certainly could not draw an objective inference of abandonment from a person's failure to follow a precatory request." *Id.* at 1451 n. 2. Even if Cuevas's actions could be construed as abandonment, any abandonment resulted from the unlawful seizure and was not voluntary.

### 5. Remedy

Cuevas does not specify each item of evidence or each statement that she seeks to suppress. From the record, it appears that the government seized the drugs and letter found in her checked bag, the address book from her purse, and her bus and claim tickets. Additionally, Cuevas made statements to officers when she was

interviewed after drugs were found in her bag.

With respect to any bus or claim check ticket surrendered by Cuevas at the time she was questioned on the bus, such items are excluded as fruits of an illegal seizure and involuntary consent. Likewise, the drugs and the letter found in her checked bag are tainted because they were found pursuant to the illegal seizure and involuntary consent.

After the drugs were found and Cuevas was arrested she consented to a search of her purse and made incriminating statements to Lugo and Rote. In addition to showing that the consent was voluntary, the government bears the burden of showing that Cuevas's consent to search her purse and to speak with officers was an "intervening act of free will" that vitiates the taint of the unlawful seizure. *Wong Sun*, 371 U.S. at 486, 83 S.Ct. 407. After Cuevas's arrest, she was advised of her *Miranda* rights in Spanish and none of the officers questioning Cuevas displayed weapons or employed coercive tactics. Accordingly, Cuevas's statements and her consent to search her purse were given voluntarily.

Although Miranda warnings may indicate that consent is voluntary, such warnings do not remove the taint of an illegal seizure. *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Consequently, the court must determine whether the connection between the unconstitutional police conduct and Cuevas's consent to search her purse and her incriminating statements are sufficiently attenuated to purge the taint of the unlawful seizure. *United States v. Brumfield,* 910 F.Supp. 1528, 1536 (D.Colo.1996), *citing Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Factors relevant to the inquiry include the temporal proximity of the arrest, the presence or absence of intervening circumstances between the events, and the purpose and flagrancy of the police conduct. *Brown v. Illinois,* 422 U.S. 590, 603–04, ●; S.Ct. 2254, 45 L.Ed.2d 416 (1975).

The questioning of Cuevas took place shortly after the unlawful seizure on the bus and the discovery of drugs in her bag. Further, no intervening circumstances are present. Absent the drugs, officers had no reason to question Cuevas. Although the bus interdiction was poorly organized and sloppily executed rather than flagrant, this factor is not sufficient to purge the taint of the unlawful seizure. Accordingly, Cuevas's statements and consent to search her purse are not sufficiently attenuated from the unconstitutional police conduct.

## CONCLUSION

For the reasons explained above, defendant's Motion to Suppress Evidence is GRANTED. All evidence seized from defendant's person, purse, and checked bag, and all statements made to law enforcement officers are HEREBY SUPPRESSED.

IT IS SO ORDERED.